RED STAR BARGE LINE, Inc. v. THE RUSSELL NO. 7 et al.

THE SEABOARD NO. 35.

No. 213, Docket 20916.

Circuit Court of Appeals, Second Circuit.

May 28, 1948.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for libellant-appellant, Red Star Barge Line, Inc.

Alexander & Ash, of New York City (Edward Ash and Sidney A. Schwartz, both of New York City, of counsel), for appellee, Russell Bros. Towing Co., Inc., claimant of the tug Russell No. 7.

Macklin, Brown, Lenahan & Speer, of New York City (Gerald J. McKernan, of New York City, of counsel), for Tully & DiNapoli, Inc., respondent-impleaded-appellee.

Before L. HAND, AUGUSTUS N. HAND and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge

This proceeding in admiralty was instituted by the libellant to recover damages to its scow Seaboard No. 35 alleged to be caused by her grounding at low water alongside the dock of Tully & DiNapoli, Inc., in Flushing Creek, New York, on the morning of June 9, 1945.

The libellant appeals from a final decree dismissing the libel and the petition filed by the claimant of the tug impleading Tully & DiNapoli, Inc., under the 56th Rule in Admiralty, 28 U.S.C.A. following section 723.

Tully & DiNapoli were the occupants of a dock known as Simpson's dock in Flushing Creek, and had been such occupants since February 15, 1944. The dock was used by them for the mooring of vessels and unloading of cargoes therefrom in furtherance of their business, and prior to the time of any damage to the scow they had agreed to discharge cargoes from various scows there including that from libellant's scow Seaboard No. 35. At about 11 p. m. on June 7, 1945, at highwater, this scow laden with a cargo of ballast was towed to the dock by claimant's tug Russell No 17 and left by the latter moored alongside the scow Radio, which was next to the bulkhead. During low tide on June 8, while lying outside the Radio, the Seaboard No. 35 grounded on her inshore side and listed offshore but received no damage.

The foregoing facts as found by the trial judge were followed by the findings set forth in the margin:[1]

Upon a discussion of conflicting testimony the court accepted the opinion of Aldrich as against that of Hansen and Bagger. Aldrich said that "a pressure due to improper loading on the deck of the boat could have been a competent and producing cause of the damage set forth in the survey." The court added the following: "The proof shows that the bottom at the Tully & DiNapoli dock was such that no boat prior to the occurrence involved in this libel had ever sustained bottom damage. Nor did the bargee in this case warn of any uneven bottom surface or hard bottom surface. His protest in effect amounted to .no more than to assert that the No. 35, loaded, would go aground in low water. Certainly to conclude that a mere uneven mud bottom could have caused the damage is not sustained by the evidence. To find negligence here would lead to a specualtion which was condemned in P. Sanford Ross, Inc. v. Moran Towing & Transportation Co., Inc., 2 Cir., 55 F.2d 1052; The Piide, 2 Cir., 135 F.2d 999."

The bargee testified that he said to the captain of the tug Russell No. 7: "You had better tie me up alongside of a light scow instead of alongside the dock, there ain't no water there for a heavy scow, and at low tide I will be on the ground with this load."

Further testimony of the bargee ran thus:

"Q. How close did you get to the dock? A. Well, I know I was a couple of feet away from the dock.

"Q. Then you left how much slack in your line? A. Oh, I left plenty of slack because I figured on low tide I would be on the ground.

"Q. You thought your boat was safe, didn't you? A. Yes, sir—well, I thought she might move further off when she hit the ground, hit the bottom.

"Q. You thought she would slide off? A. Yes, probably I did.

"Q. That is what you expected? A. Yes, sir."

6. On June 8, at the close of the working day, the foreman of respondent-impleaded, Tully & DiNapoli, Inc., advised the captain of the scow Seaboard No. 35 that the Radio, then light, would be removed later from inside the scow Seaboard No. 35. The captain of the Seaboard No. 35 stated that there was not enough water in that berth for the No. 35 as loaded and that he would not put himself in that berth. After the respondent-impleaded made fast the stern to the dock, the foreman and other workmen of the respondent, Tully & DiNapoli, went home, leaving no employees of that respondent on the dock.

7. At about 10:30 p. m. ·on June 8, 1945, the tug Russell No. 7 arrived at respondent-impleaded's dock towing the loaded scow Fowler, which she placed outside of the Seaboard No. 35. Thereupon the Russell No. 7, in some manner not satisfactorily explained, removed the Radio from between the Seaboard No. 35 and the bulkhead at the northerly berth and over the protest of the captain of the Seaboard No.· 35 pushed the Seaboard No. 35 and the Fowler to the bulkhead so that the Seaboard No. 35 was occupying a berth at the northerly end of the bulkhead.

At the time the Russell No. 7 pushed the Seaboard No. 35 into said berth, the tide was high.

8. The bottom alongside the northerly berth at said dock is uneven. No bottom damage to boats had been reported at this dock before the occurrence complained of by the libellant.

9. After the Seaboard No. 35 had been pushed alongside the bulkhead, on the succeeding low tide which occurred, at about 4:30 a. m. on June 9, 1945, the Seaboard No. 35, still fully loaded, grounded and sustained damage.

10. The captain of the scow Seaboard No. 35 did not take soundings of the depth of water at this berth, and the exact position of the berth of the scow was not definitely established by the evidence in the case. The line from the stern of the scow to the dock had a slack of about fifteen feet, and that from the bow to the dock about fifteen feet.

11. There was no bottom damage sustained by the Seaboard No. 35. The sole damage was confined to a keelson, X braces, deck stringers, and deck beams, in positions unrelated to one another. At the time the Seaboard No. 35 was loaded with approximately seven hundred tons of sand ballast.

12. The libellant failed to prove negligence of either the claimant or the respondent-impleaded.

The testimony showed that it was customary to place scows at the dock where the tug Russell No. 7 left Seaboard No. 35, as well as that there had been no report of any damage suffered at that berth. Moreover, libellant's scow had already grounded without injury when placed outside the Radio—without any protest from the bargee—a few feet from the dock. It is quite evident that the berth to which Seaboard No. 35 was shifted was not an unsafe one for loaded scows. If Seaboard No. 35 had any peculiar weakness due to her loading or structure of which her bargee was aware he should have called this fact to the attention of the Russell No. 7 in order to justify his protest against what seems to have been the normal conduct of a shifting tug in leaving her where it did.

Moreover Aldrich, whose testimony the trial judge accepted, testified that the absence of any damage to bottom planks of the scow and of any marks on them convinced him that the damage to the keelson could not have occurred from resting on the bottom. In other words, the warning given by the bargee was without any basis in fact, or in any event was made without disclosure to the tug of a reason why the scow should not have been shifted to a berth of good reputation and with no characteristic that precluded the customary mooring of scows in Flushing Creek which had frequently rested at low tide on a slightly shelving soft bottom of mud.

We think that there was no proof of negligence in this case. The protest of the bargee did not show that the berth was unsafe for scows, nor did his testimony disclose any knowledge that it was unsafe. We not only have the opinion of the trial judge and of the witness Aldrich that a mere uneven bottom could not have caused the damage, but Finding No. 9 that the scow "grounded and sustained damage" must be read in the light of the judge's specific conclusion in his opinion that the damage could not have been due to the uneven bottom.

For these reasons we do not think that a mere protest without explanation or greater logical justification was binding on the tug and transmuted an ordinary act of shifting by a tug into a tort.

Tully & DiNapoli were consignees. There was no proof that the libellant's scow was moored by them or with their assistance at a foul berth. Accordingly they should not be held liable. Waldie v. Steers Sand & Gravel Corporation, 2 Cir., 151 F.2d 129.

The decree is affirmed.

L. HAND, Circuit Judge (dissenting).

I agree that the consignee, although it was in the position of wharfinger, is not liable because the berth was foul; a fortiori the tug would not be liable were it not for the protest of the bargee. However, when the bargee told the tug master that there was "no water for a heavy scow," and that at low tide he would be "on the ground with his load," it seems to me to have been a warning that the barge was likely to be injured if put next to the wharf. The tug master did not heed this protest, and the barge was damaged quite as the bargee forewarned. That being true, it established liability. Whenever any one exposes the property of another to the risk of damage and damage ensues, I take it he must show that he had an interest to protect which matched the risk he imposed. On his own testimony, the tug master could have put the barge in the southern tier where there were "two or three barges," and, although he said that it was not the custom to do this, certainly that did not excuse him. Again, although the Fowler, which lay outside the No. 35, was also loaded the tug master did not inquire whether the Fowler's bargee would have protested at being put inside the No. 35. So I can find no interest of the tug for making the shift which matched the risk that, as I believe, she imposed upon the scow.